## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JUSTIN C. MUSTAFA,<br>          *Plaintiff*,<br><br>          v.<br><br>CAPTAIN STANLEY, ET AL.,<br>          *Defendant.* | No. 3:19-cv-1780 (VAB) |

### RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Justin Mustafa ("Plaintiff"), an inmate formerly incarcerated at MacDougall-Walker

Correctional Institute ("MacDougall") and Garner Correctional Institution ("Garner") in the

custody of the Department of Correction ("DOC"), has sued Captain Stanley and CCS Ebonie

Suggs at MacDougall, and Correction Officer Byars, Correction Officer Peletier, and Lieutenant

Swan at Garner for civil rights violations under 42 U.S.C. § 1983. Compl., ECF No. 1 (Nov. 8,

2019) ("Compl."). Mr. Mustafa has alleged violations of the Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution, and state law claims of assault and obstruction of

justice. *Id.* at 2.

On June 19, 2020, this Court issued an Initial Review Order which allowed the alleged

Eighth and Fourteenth Amendment violations as well as the state law assault claim to proceed,

and dismissed the obstruction of justice and Sixth Amendment claims. *See* Initial Review Order

at 1, ECF No. 9 (June 19, 2020) ("IRO").

Defendants have moved for summary judgment and to dismiss all remaining claims. Mot.

for Summ. J., ECF No. 45 (Feb. 26, 2022).

For the following reasons, Defendants' motion for summary judgment is **GRANTED in**

**part** and **DENIED in part.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[1]

On December 12, 2018, Mr. Mustafa was transferred from Souza Barnowski Correctional Center in Massachusetts to MacDougall under an interstate corrections compact agreement. *See* Compl. at 5 ¶ 1; Pl.'s Rule 56(a)(2) Statement of Facts at 1 ¶ 1, ECF No. 52 (Mar. 31, 2022) ("Pl.'s Rule 56(a) Statement"); Defs.' Local Rule 56(a)(1) Statement ¶ 1, ECF No. 45-2 (Feb. 26, 2022) ("Defs.' Rule 56(a) Statement"). Mr. Mustafa's claims arise from three distinct alleged incidents: the Sexual Treatment Need Score hearing, the May 25, 2019 incident with Officer Byars, and the May 26, 2019 incident with Officer Peletier. *See* Compl.

### 1.  The Sexual Treatment Needs Score

On or before January 8, 2019,[2] Mr. Mustafa was notified in writing that a hearing to assign his Sexual Treatment Needs ("STN") score was scheduled for January 11, 2019, and that non-conviction information, specifically a police report related to a July 2013 incident[3] that occurred in Massachusetts, would be considered at the hearing. *See* Pl.'s Rule 56(a) Statement 2–3 ¶¶ 6, 9; Defs.' Rule 56(a) Statement ¶¶ 6, 9; Pl.'s Dep. Ex. 1, ECF No. 45-7 (Feb. 26, 2022) ("Notification of

---

[1] The facts are taken from Mr. Mustafa's Complaint, Defendants' Local Rule 56(a) Statement, Mr. Mustafa's Local Rule 56(a) Statement, and supporting exhibits filed by all parties. *See* D. Conn. L. Civ. R. 56(a)(1) ("Each material fact set forth in the Local Rule 56(a)(1) Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)(2) Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact."). Local Rule 56(a)(2) requires the party opposing summary judgment to submit a Local Rule 56(a)(2) Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)(1) Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each admission or denial must include a citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)(2), 56(a)(3).

[2] The parties appear to agree that Mr. Mustafa received oral notice before this date. *See* Defs.' Mem. in Support of Mot. to Dismiss at 12 n.5, ECF No. 45-1 (Feb. 26, 2022) ("Defs.' Mot.") ("In fact, the plaintiff received notification of this hearing prior to January 8, 2019 as the plaintiff writes in an inmate request Form, dated January 7, 2019 that he refused to take part in that 'crazy little sex offender meeting.'"); Attachment 6 to Defs.' Mot. at 33:14–23, 34:3–14, ECF No. 45-6 (Feb. 26, 2022) ("Pl.'s Dep.") (noting that Plaintiff was originally notified of the hearing orally by Captain Stanley, but Plaintiff could not remember the exact date this occurred).

[3] This incident involved allegations from Mr. Mustafa's ex-girlfriend that he forced her to perform sexual acts on his dog. *See* Attachments to Feb. 2021 Suggs Decl. at 11–13, ECF No. 46 (Feb. 26, 2022) ("Attachments to Feb. 2021 Suggs Decl."). Mr. Mustafa denies that the conduct in the police report happened. Pl.'s Dep. at 41:15–18. Mr. Mustafa stated that the bestiality-related charge was brought to trial, but the judge "found that it didn't have merit to actually go to jury[, s]o in the middle of the trial the Judge dismissed the charge." Pl.'s Dep. at 18:10–13.

Hearing for STN Score").[4] The DOC's standardized classification process assigns each inmate a number between 1 and 5 for various "risks" and "needs" factors, one of which is the STN score. *See* Pl.'s Rule 56(a) Statement 2 ¶ 3; Defs.' Rule 56(a) Statement ¶ 3; Pl.'s Decl. Ex. A, ECF No. 54-1, (Mar. 31, 2022) ("Classification Rev. Sheet"); Suggs Decl. ¶ 3, ECF No. 45-10 (Feb. 26, 2022) ("Feb. 2021 Suggs Decl.").

On January 11, 2019, Mr. Mustafa attended and made statements at the Hearing to Assign an STN Score, which Defendants Ebonie Suggs, the Counselor Supervisor at Walker, and Captain Stanley led. Pl.'s Rule 56(a) Statement 3–4 ¶ 9–10; Defs.' Rule 56(a) Statement ¶ 9–10; Pl.'s Dep. at 36:9–23. During the January 11, 2019 hearing, Mr. Mustafa argued that he was not convicted of the bestiality charge in Massachusetts and therefore, the DOC could not rely on that information to assign an STN score. Defs.' Rule 56(a) Statement ¶ 10; Pl.'s Rule 56(a) Statement 3–4 ¶ 10; Pl.'s Dep. Ex. 3, ECF No. 45-7 (Feb. 26, 2022) ("Hearing for STN Score"); Pl.'s Dep. at 36:24–37:24 (denying that he said he would assault someone if he was forced to undergo sexual treatment, but stating "everything else" on the Hearing for Sexual Treatment Need Score form "sounds like something I may have said," albeit "not . . . verbatim").

At the conclusion of the hearing, Ms. Suggs completed the Hearing for Sexual Treatment Need Score form, assigning Mr. Mustafa an STN score of 2VN. Defs.' Rule 56(a) Statement ¶ 11; Suggs Decl. ¶ 9, ECF No. 55-3 (Apr. 12, 2022) (Apr. 2022 Suggs Decl."). Ms. Suggs submitted the score to the classification committee on January 16, 2019, at which point the Director of Population Management assigned the scores. Pl.'s Rule 56(a) Statement ¶ 9; Apr. 2022 Suggs Decl. 4 ¶ 12.

On January 11, 2019, after the hearing concluded, Mr. Mustafa was presented with a document titled "Classification Review Sheet" that was signed by Ms. Suggs on January 9, 2019 and

---

[4] The notice states the inmate "may receive a discretionary Sexual Treatment Need Score due to the reason(s) listed below. A hearing will be held to review the reasons for a possible score greater than 1." Notification of Hearing for STN Score.

included an STN score of 2VN.[5] *See* Classification Rev. Sheet; Apr. 2022 Suggs Decl. ¶ 5; Pl.'s

Decl. ¶ 8., ECF No. 54 (Mar. 31, 2022) ("Pl.'s Decl."); Pl.'s Dep. at 38:25–39:3. Defendants argue

that the Classification Review Sheet that Ms. Suggs signed on January 9, 2019 was an initial

determination of the STN score, which was then "replaced" by the STN score assigned after the

hearing. Apr. 2022 Suggs Decl. ¶¶ 5–6; Suggs Dep. at 31:15–16. Mr. Mustafa stated that he was told

he "was going to receive a sex offender classification score based upon non-conviction information"

and, after viewing the Classification Review Sheet, Mr. Mustafa determined "[t]he decision to assign

[him] a[n] STN score had already been determined prior to any 'hearing.'" Pl.'s Decl. ¶¶ 7–8; Pl.'s

Rule 56(a) Statement 3–4 ¶ 10.

The Classification Review Sheet is marked as an "initial review," states the date of review

was January 8, 2019, and includes a note in the comment section stating "[a]ssessment completed,

OAP reviewed." Classification Rev. Sheet. The Classification Review Sheet is intended to provide

the inmate notice that "something" has happened. Suggs Dep. at 32:6–8.

The DOC has a policy by which it keeps an inmate's STN score confidential. Pl.'s Rule 56(a)

Statement 4 ¶ 13; Defs.' Rule 56(a) Statement ¶ 13. Mr. Mustafa did not participate in any sex

treatment program while in the DOC. Pl.'s Rule 56(a) Statement 4 ¶ 14. Mr. Mustafa had not been

required to participate in mental health services in the Massachusetts Department of Corrections and

never needed medication; however, after receiving the STN score, Mr. Mustafa was hospitalized

several times and took daily medication. Pl.'s Decl. ¶ 9.

Mr. Mustafa stated that, as a result of the STN score, he was given "a label or 'jacket'" as a

sex offender, which led to harassment from other inmates, and that this, in turn, led to him spending

---

[5] Ms. Suggs stated that she was required to present Mr. Mustafa with the Classification Review Sheet and she may have shown the document to Mr. Mustafa at some point on January 11, 2019. Ex. 1 to Pl.'s Rule 56(a) Statement at 33:15–34:1, ECF No. 52-1 (Mar. 31, 2022) ("Suggs. Dep.") ("It looks like [it was presented] on the 11th, but I can't recall 100 percent."). Mr. Mustafa stated that he was shown the Classification Review Sheet by Captain Stanley after the January 11, 2019 hearing had concluded. Pl.'s Dep. at 38:21–39:6; Pl.'s Decl. ¶ 8.

substantial periods of time in solitary confinement. Pl.'s Decl. ¶ 9; Pl.'s Dep. at 43:10–15, 48:2–4.

Mr. Mustafa stated that if he were not in solitary confinement, he would have been able to "acquire

training as well as good time" served, which would have allowed him to return to his family sooner.

Pl.'s Decl. ¶ 9. During his time in DOC custody, Mr. Mustafa would regularly harm himself until he

needed medical attention but not enough to cause himself severe damage in an attempt to "get as

many medical bills as humanly possible" so that DOC would send him back to Massachusetts. Pl.'s

Dep. at 28:1–29:1. On March 11, 2019, Mr. Mustafa was transferred to Garner Correctional Institute

due to his mental health issues. Pl.'s Decl. ¶ 10.

### 2.  The May 25, 2019 Incident with Officer Byars

Mr. Mustafa alleges that, on May 25, 2019, Officer Byars brought Mr. Mustafa a "special

food tray" which Mr. Mustafa believed to be contaminated. Compl. 7 ¶¶ 13–16; Pl.'s Dep. at 54:20–

23. Mr. Mustafa, in an attempt to get attention from other staff, "h[e]ld the wicket" on the cell door

closed so that Officer Byars could not put the tray through. Pl.'s Dep. at 54:25–55:4. Officer Byars

allegedly placed a key between his knuckles and repeatedly stabbed Mr. Mustafa's hand, piercing

one of Mr. Mustafa's fingers. *Id.* at 55:4–8. Officer Byars then allegedly attempted to close the

wicket on Mr. Mustafa's hand. *Id.* at 55:8–11. Once Officer Byars released Mr. Mustafa's hand,

Officer Byars allegedly refused to call a Lieutenant until Mr. Mustafa put his blood on the cell door

window. *Id.* at 61:10–14. Mr. Mustafa was taken to the internal medical center and then for outside

medical treatment. *Id.* at 61:23–62:1. Mr. Mustafa did not suffer any fractures or require any stitches

for the injuries to his hand, but his hand was wrapped. *Id.* at 66:16–67:6.

On several occasions, Mr. Mustafa allegedly requested that Lieutenant Swan allow Mr.

Mustafa to contact the state police and report Officer Byars' assault. Compl. 9 ¶ 24. Lieutenant Swan

allegedly denied these requests. *Id.*

On June 6, 2019, Mr. Mustafa submitted a Level 1 grievance related to the May 25, 2019 incident. *See* Attachments to Kingsley Decl. at 25, ECF No. 45-5 (Feb. 26, 2022) ("Grievances"). In this initial grievance, Mr. Mustafa stated that he did not submit the required informal written complaint because "due to the serious nature of this staff misconduct [he] was advised that submitting a CN 9601 informal complaint would be inappropriate." *Id.* On June 6, 2019, Mr. Mustafa's grievance was returned without disposition, stating that he would need to attempt informal resolution prior to filing a Level 1 complaint. *Id.* at 23.

On June 24, 2019, Mr. Mustafa submitted a Level 1 grievance related to the May 25, 2019 incident. Pl.'s Rule 56(a) Statement 3–4 ¶ 10; Defs.' Rule 56(a) Statement ¶ 10. This grievance was marked received on June 26, 2019. Grievances at 29. This Level 1 grievance was rejected on July 22, 2019 because it was deemed to be untimely. *Id.*

On July 24, 2019, Mr. Mustafa filed a Level 2 grievance appealing the rejection of his Level 1 grievance because he filed the Level 1 grievance on June 24, 2019, which was thirty days from the date of the incident and therefore timely. *Id.* at 35. The Level 2 grievance was marked received on August 5, 2019. *Id.* On July 16, 2019, Mr. Mustafa submitted a letter to the RHO Counselor, and sent copies to Warden Hannah, Grievance Administrator Olson, and Unit Manager Hordle, requesting that, if he is transferred before his grievances are adjudicated, any grievance decisions and the necessary appeal paperwork be forwarded to him. Pl.'s Rule 56(a) Statement 8 ¶ 2. From August 21, 2019 through August 25, 2019, Mr. Mustafa wrote to various officials at Garner, including Grievance Coordinator Olson, Warden Hannah, Cody Kingsley, and District Administrator Mulligan, requesting an update on his pending grievances. *Id.* 8–9 ¶¶ 3–6.

On September 5, 2019, the Level 2 grievance was deemed "compromised" because the Level 1 grievance may have been timely. Grievances at 45. More specifically, the DOC staff tasked with collecting grievances did so at 8 a.m. on June 24, 2019 and then did not do so again until June 26, 2019 at 10:20 a.m. *Id.* at 39. Therefore, if Mr. Mustafa had filed his Level 1 grievance on June 24th,

it would not have been "received" until June 26th. *See Id.* at 45. The Level 2 compromise allowed Mr. Mustafa to re-file his Level 1 grievance within 5 days of Mr. Mustafa's receipt of the Level 2 decision. *Id.* at 35.

Mr. Mustafa was transferred from Garner Correctional Institute to a Massachusetts correctional institution on September 19, 2019. Pl.'s Rule 56(a) Statement 9 ¶ 9. Mr. Mustafa stated that he did not receive the September 5, 2019 compromise until September 30, 2019. *Id.* Typically, once the Level 2 review is complete, the Administrative Remedies Counsel would have provided a copy of the disposition to the unit counsel who would then give it to the inmate, Kingsley Decl. ¶ 7, however, the DOC does not have any record of when the Level 2 disposition was provided to Mr. Mustafa, *id.* ¶ 8.

On September 30, 2019, Mr. Mustafa allegedly wrote a letter to Grievance Coordinator Olsen letting him know that he received the decision but did not have the necessary documents to re-submit the Level 1 grievance within 5 days. Pl.'s Rule 56(a) Statement 9–10 ¶¶ 10–12. Defendants state there is no record that anyone at Garner received this letter and, if it had been received, it would have been retained in Mr. Mustafa's file. *See* Kingsley Decl. ¶¶ 9–10. Mr. Mustafa never received a response from Grievance Coordinator Olson or any other representative from Garner. Pl.'s Rule 56(a) Statement 9–10 ¶ 12.

### 3.  The May 26, 2019 Incident

On May 26, 2019, Mr. Mustafa alleges that Officer Peletier used the cell trap door to throw a Styrofoam cup of juice into his cell. Pl.'s Rule 56(a) Statement ¶ 24; Defs.' Rule 56(a) Statement ¶ 24; Pl.'s Dep. at 69:24–70:2. As a result, the juice allegedly spilled on Mr. Mustafa's upper torso and face, as well as the floor. Pl.'s Rule 56(a) Statement 7 ¶ 25; Defs.' Rule 56(a) Statement ¶ 25; Pl.'s Dep. at 74:7–12. Mr. Mustafa alleges that, before walking away, Officer Peletier pointed to his badge and said "you mess with one of us, you mess with all of us." Pl.'s Dep. at 70:2–8. Mr. Mustafa

allegedly used his "Ferguson gown" to wipe up the spilled juice, which left him with no clean clothing to wear. Pl.'s Rule 56(a) Statement 7 ¶ 26; Defs.' Rule 56(a) Statement ¶ 26; Pl.'s Dep. at 76:6–10.

Mr. Mustafa allegedly suffered emotional harm because he did not know Officer Peletier and anticipated further retaliation. Pl.'s Rule 56(a) Statement at 10 ¶ 16. Mr. Mustafa allegedly did not seek medical attention for any physical injuries, but did seek treatment for the emotional harm he suffered. Pl.'s Rule 56(a) Statement 7 ¶ 27–28; Defs.' Rule 56(a) Statement ¶ 27–28.

### B. Procedural History

On November 8, 2019, Mr. Mustafa, initially proceeding *pro se*, filed a Complaint alleging violations of the Sixth, Eighth, and Fourteenth Amendments, as well as state law assault and obstruction of justice claims. Compl.

On June 19, 2020, this Court issued an Initial Review Order which dismissed the Sixth Amendment claim, the Eighth Amendment claim related to alleged tampering with Mr. Mustafa's food, and the state law obstruction of justice claim. *See* IRO at 1. This Court allowed the remaining Eighth and Fourteenth Amendment claims, as well as the assault claim, to proceed. *Id.*

On November 8, 2019, Mr. Mustafa filed a motion to appoint counsel. Mot. to Appoint Counsel, ECF No. 3 (Nov. 8, 2019).

On June 19, 2020, the Court denied the motion because Mr. Mustafa did not include any information in his motion about his ability to afford counsel or whether he attempted to contact any attorneys on his own. Order, ECF No. 10 (June 19, 2020).

On July 23, 2020, Mr. Mustafa filed a motion for reconsideration of the Court's denial of his motion to appoint counsel. Mot. for Recons., ECF No. 13 (July 23, 2020).

On November 6, 2020, the Court granted the motion for reconsideration and on November 12, 2020, the Court entered an order appointing pro bono counsel. Order, ECF No. 23 (Nov. 6, 2020); Order Appt. Pro Bono Counsel, ECF No. 24 (Nov. 12, 2020).

On February 26, 2022, Defendants filed a motion for summary judgment, including a memorandum in support, Rule 56(a) statement of facts, and various exhibits. *See* Defs.' Mot.; Defs.' Rule 56(a) Statement.

On March 31, 2022, Plaintiff filed an objection to the motion for summary judgment, Rule 56(a) Statement of Facts, and Mr. Mustafa's Declaration. *See* Pl.'s Obj. to Mot. for Summ. J., ECF No. 53 (Mar. 31, 2022) ("Pl.'s Opp'n"); Pl.'s Rule 56(a) Statement; Pl.'s Decl.

On April 12, 2022, Defendants submitted a reply in support of their motion for summary judgment. Reply, ECF No. 55 (Apr. 12, 2022) ("Reply").

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in the original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.

1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can

affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need

for a trial—whether, in other words, there are any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either

party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by

documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of

material fact," the non-moving party must do more than vaguely assert the existence of some

unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated

speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation

omitted).

The party opposing the motion for summary judgment "must come forward with specific

evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence

is merely colorable, or is not significantly probative, summary judgment may be granted."

*Anderson*, 477 U.S. at 250 (first citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); and

then citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record,

including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any

other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed.

R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D.

Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light

most favorable to the non-moving party and to draw all reasonable inferences in [his] favor."

*Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013)

(citation omitted). If there is any evidence in the record from which a reasonable factual

inference could be drawn in favor of the non-moving party for the issue on which summary

judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old*

*Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III.   DISCUSSION

### A.  Exhaustion

The PRLA provides that "[n]o action shall be brought with respect to prison conditions . .

. by a prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion

requirement applies to all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 532

(2002), regardless of whether the inmate may obtain the specific relief he desires through the

administrative process, *Booth v. Churner*, 532 U.S. 731, 738 (2001).

Failure to exhaust administrative remedies under 42 U.S.C. § 1997e(a) is an affirmative

defense. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Thus, defendants have the burden of

proving that a plaintiff has not exhausted claims before filing in court. *Hubbs v. Suffolk Cnty.*

*Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

The PLRA requires "proper exhaustion," which includes complying with all "procedural

rules," including filing deadlines, as defined by the particular prison grievance system. *Woodford*

*v. Ngo*, 548 U.S. 81, 90–91 (2006). In other words, "untimely or otherwise procedurally

defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion

requirement." *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (quoting

*Woodford*, 548 U.S. at 83–84).

The exhaustion requirement, however, may be excused when the remedy is not available in practice even if it is "officially on the books." *See Ross v. Blake*, 578 U.S. 632, 643 (2016). Thus, "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 642 (quoting *Booth*, 532 U.S. at 738).

The United States Supreme Court has established three circumstances under which an inmate need not exhaust the administrative procedure as it is deemed unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use;" or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–644. "Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs*, 788 F.3d at 59.

Although a defendant bears the burden on this affirmative defense at all times, the plaintiff may still have to adduce evidence in order to defeat a motion for summary judgment. *See Hudson v. Kirkey*, No. 9:20-cv-581 (LEK/DJS), 2021 WL 1966721, at *3 (N.D.N.Y. May 17, 2021) (explaining that once defendant introduces evidence of a functional grievance system, plaintiff could not survive summary judgment without submitting competent evidence to indicate unavailability).

The parties dispute whether Mr. Mustafa is excused from exhausting his misuse of force claim and his deliberate indifference claim against Officer Byars.

The Court will address each in turn.

12

### 1.  The Misuse of Force Claim Against Officer Byars

Administrative Directive 9.6 ("A.D. 9.6") governs grievances inmates may have for any "issue[s] relating to any aspect of an inmate's confinement" at Garner. Administrative Directive 9.6 at 1, ECF No. 45-4 (Feb. 26, 2022) ("A.D. 9.6").

A.D. 9.6(6) requires an aggrieved inmate to attempt informal resolution prior to filing a grievance. *Id.* at 5. To seek informal resolution, "the inmate shall submit a written request via CN 9601, Inmate Request Form." *Id.* Once submitted, "[a] response . . .  shall be made within 15 business days from receipt of the written request." *Id.*

A.D. 9.6(6)(C) provides that the Level 1 Grievance must be filed within thirty calendar days from the date of "the occurrence or discovery of the cause of the grievance" and should include a copy of the response to the written CN 9601 request to resolve the matter informally or explain why the CN 9601 response is not attached. *Id.* at 6. The Unit Administrator is required to respond in writing to the Level 1 grievance within thirty business days of receipt of the grievance. *See id.* at 7. If an inmate does not receive a response to a Level 1 grievance within 30 business days, they may appeal to Level 2. *Id.*

A Level 2 grievance may be filed within five business days of receipt of the Level 1 decision. *Id.* The Level 2 decision must be made "in writing within 30 business days of receipt . . . and shall include a statement of the remedy" or the reason for denial. *Id.* An inmate may appeal certain Level 2 dispositions to Level 3, so long as the appeal is made within five days of receipt of the Level 2 disposition. *Id.* An inmate may appeal to Level 3 to "challenge[] Department level policy"; "challeng[] the integrity of the grievance procedure; or" appeal a grievance that "[e]xceeds the established 30 business day time limit for a Level 2 grievance response." *Id.* For an inmate that wishes to submit a Level 3 appeal based on lack of timely response to a Level 2

appeal, must do so within 35 days of filing the Level 2 appeal. *Id.* at 8. The Level 3 review shall be completed, and a response given in writing, within 30 business days of receipt. *Id.* at 7.

Inmates must submit grievances or appeals of the disposition of a prior grievance "by depositing them in a locked box clearly marked as 'Administrative Remedies.'" *Id.* at 3. These lock boxes are available in the DOC facilities. *Id.*

A.D. 9.6 states that "inmates housed in other states/jurisdictions must utilize and exhaust the Inmate Administrative Remedies Process of the receiving state/jurisdiction for an issue relating to any aspect of an inmate's confinement that is subject to the receiving state/jurisdiction's authority." *Id.* at 5. Further, "Connecticut inmates housed in other states/jurisdictions shall have 30 calendar days to file a grievance with the Connecticut Department of Correction upon exhausting the receiving state/jurisdiction's Inmate Administrative Remedies Process." *Id.* A.D 9.6, however, does not appear to address a situation in which the grievance was filed with the DOC while the inmate was housed in Connecticut, but the inmate is transferred to another jurisdiction before receiving a final outcome.

Defendants argue that Mr. Mustafa failed to exhaust his administrative remedies because he received the compromise on his Level 2 appeal, understood that the compromise required him to re-file his Level 1 appeal so that it could be considered on the merits, and thereafter, Mr. Mustafa failed to re-file his Level 1 appeal. Defs.' Mot. at 8–9. Defendants further argue that the administrative grievance process outlined in Administrative Directive was available to Mr. Mustafa because he could have filed a Level 3 appeal prior to his September 19, 2019 transfer, even if he had not received a response to his Level 2 appeal. Reply at 4. In the alternative, Defendants argue Mr. Mustafa could have re-submitted the Level 1 grievance after receiving the

Level 2 disposition by mail, even without the proper forms, and it would have been processed. *Id.* at 5.

Plaintiff does not deny that he received the compromise on his Level 2 appeal, understood that it required him to re-file his Level 1 appeal, and that he then failed to re-file his Level 1 appeal. Pl.'s Opp'n at 13. Plaintiff argues that the administrative procedures were unavailable to him because he did not receive the Level 2 compromise until September 30, 2019, at which point, he had been transferred to a Massachusetts correctional facility and therefore, could not access the Garner administrative procedures. *Id.* at 13–14. In the alternative, Plaintiff argues that once Mr. Mustafa was no longer an inmate of the Connecticut Correctional Institute, he was not subject to Administrative Directive 9.6 because the policy defines inmates as persons in the custody or under the supervision of the Connecticut Department of Correction. *Id.* at 15.

The Court agrees, in part.

An administrative grievance scheme can be so opaque that is it unavailable if the relevant sections do not provide a clear answer regarding how to pursue a particular administrative remedy. *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 124–26 (2d Cir. 2016) (holding that the administrative procedures were "prohibitively opaque" in part because the procedures "d[id] not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response"); *see also Johnston v. Maha*, 460 F. App'x 11, 15 (2d Cir. 2012) ("The PLRA does not require prisoners to reach across jurisdictional lines to take advantage of grievance systems that are no longer available to them.")

For example, in *Carter v. Revine*, the plaintiff began the administrative grievance process under A.D. 9.6 in one facility but was transferred to another facility (also in Connecticut) before he was able to complete the process. No. 3:14-cv-1553 (VLB), 2017 WL 2111594, at *11 (D.

15

Conn. May 15, 2017). The court found A.D. 9.6 was "so opaque" as to be "practically speaking, incapable of use" because the procedures "do[] not set forth any policy whatsoever instructing inmates on how to navigate the grievance process upon a transfer." *Id.* at *12.

In response to the *Carter* plaintiff's arguments on this point, the defendants stated that they told the plaintiff he could complete the process by mailing his appeal to the facility where he began the process. *Id.* at *11–12. The court, however, found this problematic because the DOC staff instructions to continue the appeal process by mail directly contradicted with A.D. 9.6, which states that appeals and grievances may only be filed by placing the forms in the "Administrative Remedies" box. *Id.*; *see also Sease v. Frenis*, No. 3:17-cv-770 (SRU), 2021 WL 260398, at *9 (D. Conn. Jan. 25, 2021) ("If the absence of guidance in a grievance procedure can lead to an administrative scheme's being 'prohibitively opaque,' *Priatno*, 829 F.3d at 124–27, then surely contradictory instructions in a grievance procedure can also lead to an administrative scheme's being prohibitively opaque.").

Here, A.D. 9.6 is similarly opaque in its applicability to Mr. Mustafa's particular situation.

The parties disagree about when Mr. Mustafa received the Level 2 disposition that instructed him to re-file his Level 1 grievance. Mr. Mustafa argues that he asked DOC officials about the status of his Level 2 disposition numerous times during the month of August but did not receive the Level 2 decision until after he was transferred to Massachusetts on September 19, 2019. *See* Pl.'s Rule 56(a) Statement ¶¶ 2–6, 9. Defendants argue that Mr. Mustafa received the Level 2 disposition on September 5, 2019 because, typically, the Administrative Remedies Counsel would have provided a copy of the disposition to the unit counselor who would then give it to the inmate. Kingsley Decl. ¶ 7. Defendants, however, do not have any record of when the Level 2 disposition was provided to Mr. Mustafa. *Id.* ¶ 8.

16

If Mr. Mustafa received the Level 2 disposition before he was transferred, the administrative

procedures would have been sufficiently available, and he would not have been justified in failing to

exhaust his administrative remedies. *See Lindsay v. Chapdeliane*, No. 3:19-cv-826 (JCH), 2021 WL

752841, at *7 (D. Conn. Feb. 19, 2021) (finding the administrative procedures were available to the

plaintiff because "[a]lthough prison officials transferred [the plaintiff] to two different facilities after

the incident at MacDougall-Walker, [the plaintiff] remained at MacDougall-Walker for thirty-two

days before his first transfer" and after the incident underlying the plaintiff's complaint). Therefore,

the question of whether Mr. Mustafa received his Level 2 disposition while still in custody at Garner

is a genuine dispute of a material fact that the Court cannot resolve at the summary judgment stage.[6]

Even assuming Mr. Mustafa did not receive the Level 2 disposition until after his September

19, 2019 transfer, a genuine dispute about a material fact remains. A.D. 9.6 addresses how an inmate

under DOC supervision or custody may file a grievance or appeal, *see* A.D. 9.6 at 3, and how an

inmate under the supervision of another state may start the grievance process, *see id.* at 5, but does

not directly address Mr. Mustafa's situation where he has started the grievance process and then was

transferred out of state. Additionally, while A.D. 9.6(5)(K) appears to apply only to Connecticut

inmates under the supervision of another state, A.D. 9.6(3)(G) defines the term inmate, as used

within the A.D. 9.6 procedures, as someone "in the custody of the Commissioner of Correction[,] . . .

includ[ing] those confined in a facility or under community supervision." A.D. 9.6 at 2. Once Mr.

Mustafa was transferred to the custody of Massachusetts, it is unclear whether he was subject to A.D.

9.6's requirements at all and, if he was subject to A.D. 9.6's requirement, it was unclear how he

would go about exhausting his pending claims. Therefore, A.D. 9.6 was "prohibitively opaque" to

---

[6] Defendants argue that, even assuming Mr. Mustafa did not receive his Level 2 disposition prior to being transferred, the 30-day Level 2 review period had passed while Mr. Mustafa was at Garner and therefore, Mr. Mustafa could have filed a Level 3 appeal after September 5 but before September 19. *See* Reply at 4; A.D. 9.6 at 7–8. Defendants do not point to, and the Court has not identified, anything in A.D. 9.6 or elsewhere that states Mr. Mustafa was required to file a Level 3 appeal once the 30-day window expired without a response.

inmates in Mr. Mustafa's situation, who were transferred while an administrative grievance was pending. *See Sease*, 2021 WL 260398, at *9 ("If the absence of guidance in a grievance procedure can lead to an administrative scheme's being 'prohibitively opaque,' *Priatno*, 829 F.3d at 124–27, then surely contradictory instructions in a grievance procedure can also lead to an administrative scheme's being prohibitively opaque.").

In the alternative, Defendants contend that Mr. Mustafa was transferred with his legal papers[7] and, even if he did not have the requisite grievance forms, Garner would have reviewed his Level 1 grievance in the normal course, had he submitted something by mail. Reply at 5; Kingsley Decl. ¶ 11. There is no evidence in the record, however, to suggest that Mr. Mustafa was aware that he could re-file his Level 1 grievance without the requisite forms. Indeed, Mr. Mustafa stated that he did write to officials at Garner about re-filing his Level 1 grievance, but never received a response.[8] Pl.'s Rule 56(a) Statement 9–10 ¶ 12.

Moreover, even if Mr. Mustafa had been told he could re-file his Level 1 grievance by mail without the requisite forms, this procedure would have directly conflicted with the requirements of A.D. 9.6, which states that an inmate must submit a grievance or appeal in a locked box titled "Administrative Remedies" and must be submitted on the proper form. A.D. 9.6 at 3. Therefore, the grievance procedure may still have been "prohibitively opaque." *See Carter*, 2017 WL 2111594, at *11–12.

Based on the various competing accounts of what happened, there is a genuine factual dispute about whether the administrative procedures were unavailable to Mr. Mustafa. A jury, not this Court, must decide the credibility of these competing accounts. *See Anderson*, 477 U.S. at

---

[7] Mr. Mustafa disputes this and states that "[n]one of his belongings" were transferred with him. Pl.'s Rule 56(a) Statement 9 ¶ 7.

[8] Defendants contest this fact, as they do not have a record of ever receiving this letter. Kingsley Decl. ¶ 6.

255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Accordingly, the Court will deny the motion as it relates to Mr. Mustafa's misuse of force claim against Officer Byars.

### 2. Deliberate Indifference Claim Against Officer Byars

For Mr. Mustafa's deliberate indifference claim, the parties do not identify the proper administrative grievance scheme that applies. Defendants instead argue that Mr. Mustafa has not exhausted his claims under either A.D. 9.6 or Administrative Directive 8.9 ("A.D. 8.9").

When analyzing whether a deliberate indifference to medical needs claim against a correction officer has been properly exhausted, the appropriate grievance procedure is A.D. 9.6, not A.D. 8.9. A.D. 9.6 states that it governs grievances inmates may have for any "issue[s] relating to any aspect of an inmate's confinement," A.D. 9.6 at 1, whereas Administrative Directive 8.9 specifically applies only to review of "a diagnosis or treatment" and review of "a practice, procedure, administrative provision or policy, or allegation of improper conduct by a health services provider," Administrative Directive 8.9 at 3, ECF No. 45-3 (Feb. 26, 2022) ("A.D. 8.9"). Here, Mr. Mustafa's deliberate indifference claim concerns Officer Byars, who is not a health service provider and who was not responsible for providing Mr. Mustafa with any diagnosis or treatment.[9] Thus, A.D. 9.6 governs Mr. Mustafa's grievance concerning this claim.

---

[9] Notably, the Second Circuit recently affirmed a district court's dismissal of an inmate's deliberate indifference to medical needs claim based on his failure to exhaust the claim under A.D. 9.6. *See Wilson v. McKenna*, 661 F. App'x 750, 753 (2d Cir. 2016) (summary order). Other Second Circuit courts similarly analyze exhaustion of deliberate indifference claims under A.D. 9.6 for the same reasons outlined in this ruling. *See, e.g.*, *Jumpp v. Thibodeau*, No. 3:19-CV-1723 (KAD), 2020 WL 7263273, at *3 (D. Conn. Dec. 10, 2020) ("As neither [defendants] Jones nor Kelly are health service providers, the deliberate indifference to medical needs claims asserted against them must be exhausted utilizing the procedures outlined in Directive 9.6."); *Cosby v. Tawana*, No. 3:19-CV-401 (MPS), 2020 WL 4284561, at *4 (D. Conn. July 27, 2020) ("[T]he plaintiff's claims related to . . . deliberate indifference to medical needs by custody staff . . . are subject to the Inmate Grievance Procedure set forth in Administrative Directive 9.6(6)."); *Durham v. Hanna*, No. 3:19CV190 (KAD), 2020 WL 4586688, at *6 (D. Conn. Aug. 10, 2020) (stating that for "Eighth Amendment claims based on deliberate indifference to his safety and/or medical need"

Defendants argue that Mr. Mustafa failed to exhaust his deliberate indifference claim against Officer Byars because he failed to properly exhaust this claim under A.D. 9.6 for the same reasons that Defendants argue the misuse of force claim was not properly exhausted. Defs.' Mot. at 10. Additionally, Defendants argue that Mr. Mustafa did not properly exhaust this claim because he did not reference his deliberate indifference to medical needs claim with sufficient specificity in his grievances. *Id.*[10]

The Court disagrees.

To properly exhaust administrative remedies under the PRLA, an inmate "must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). A grievance is sufficient "if it alerts the prison to the nature of the wrong for which redress is sought." *Id.* However, a "grievant need not lay out the facts, articulate legal theories, or demand particular relief." *Id.* "[I]nmates navigating prison administrative procedures without assistance cannot be expected to satisfy a standard more stringent than that of notice pleading." *Id.*

Here, Plaintiff's grievance includes a specific date, time, location, and officer. Grievances at 85. Mr. Mustafa's grievance alleges that Officer Byars assaulted him, leaving his hand injured and that after the alleged assault Mr. Mustafa "requested that c/o Byars call a Lieutenant which he initially refused to do. It was not until [Mr. Mustafa] put blood on the window that a supervisor was notified." *Id.* While Mr. Mustafa does not specifically state in the grievance that he required medical care, the date, time, location, and officer name were sufficient to put the prison on notice to investigate whether Officer Byars was deliberately indifferent to Mr.

---

plaintiff was "obligated to exhaust his administrative remedies . . . under Administrative Directive 9.6 with respect to his claims against custody staff").

[10] Plaintiff does not appear to address these arguments explicitly.

Mustafa's medical needs, particularly in light of the alleged assault described in the grievance. *See Brown v. Austin*, No. 05 Civ. 9443, 2009 WL 613316, at *4 (S.D.N.Y. Mar. 4, 2009) (noting that "date, time and location" are sufficient to put the prison on notice because "[t]he point is that prison officials had the necessary information to investigate the complaints and the opportunity to learn which officers were involved in the alleged incident").

Accordingly, the Court will deny the motion to dismiss as to the deliberate indifference claim.

### B.  Due Process Claim

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. In determining whether an incarcerated individual has stated a procedural due process claim, a court "first ask[s] whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

To succeed on a Section 1983 claim "for denial of due process arising out of a disciplinary hearing, a plaintiff must establish that he (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process." *Williams v. Chuttey*, 767 F. App'x 105, 107 (2d Cir. 2019) (summary order) (citing *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004)). The liberty interest must "subject the prisoner to 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Vega v. Lantz*, 596 F.3d 77, 83 (2d Cir. 2010) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

The Second Circuit has held that the improper classification of an inmate as a sex offender may have a stigmatizing effect, which implicates a liberty interest for purposes of due process. *Id.* at 81–82 (finding the inmate's claim that prison officials wrongfully assigned him a level-3 sexual

treatment needs score even though he had not been convicted of a sexual offense, although typically a state-law defamation claim, rose to constitutional dimension). Thus, in order to state a due process violation, a plaintiff must "demonstrate 'a stigmatizing statement plus a deprivation of a tangible interest.'" *Id.* at 81 (quoting *Algarin v. Town of Wallkill*, 421 F.3d 137, 138 (2d Cir. 2005)); *see also Moore v. Chapdelaine*, No. 3:15-CV-775 (VAB), 2018 WL 638995, at *6 (D. Conn. Jan. 31, 2018).

There are two components to a 'stigma plus' claim. *Moore*, 2018 WL 638995, at *6. Mr. Mustafa first must establish the "stigma" by demonstrating "the utterance of a statement sufficiently derogatory to injure [his] reputation that is capable of being proved false, and that [he] claims is false." *Vega*, 596 F.3d at 81. Mr. Mustafa must next demonstrate the "plus," "a material state-imposed burden or state-imposed alteration of [his] status or rights." *Id.* "This state-imposed alteration of status or burden must be 'in addition to the stigmatizing statement.'" *Id.* at 81 (quoting *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004)). "However, 'deleterious effects [flowing] directly from a sullied reputation,' standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine." *Sadallah*, 383 F.3d at 38 (quoting *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994)).

Defendants argue Plaintiff cannot prove the stigma aspect of his claim because he has not shown that the underlying allegations in the Massachusetts police report are false. Defs.' Mot. at 14 n.9. In the alternative, Defendants argue Plaintiff has not proved the "plus" aspect of his stigma plus claim because Plaintiff was not required to participate in sex treatment and his sentence was not impacted in any way. *Id.* at 14.

Mr. Mustafa responds that he can establish the "plus" aspect of his stigma plus claim because he was harassed by staff and inmates, which lead to Mr. Mustafa spending significant time in solitary confinement. Pl.'s Opp'n at 17. Mr. Mustafa notes that before receiving his STN score, he did not have any mental health issues, but after receiving the score, he was hospitalized several times, required to take medication daily, and committed to a state hospital. *Id.* Mr.

Mustafa also argues that, if he had not spent so much time in solitary confinement, he would have been able to acquire training, as well as good time served which would have allowed him to return home sooner. *Id.*

An essential element of a stigma plus claim is that the stigmatizing statement must be published "by the offending governmental entity." *Vega*, 596 F.3d at 82 (quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 446 (2d Cir. 1980)); *see also Velez*, 401 F.3d at 89 ("The defamatory statement must be sufficiently public to create or threaten a stigma.") (citation omitted).

Here, the DOC policy requires an inmate's STN scores to be kept confidential. *See* Defs.' Rule 56(a) Statement 4 ¶ 13; Feb. 2021 Suggs Decl. ¶ 15; Suggs Dep. at 34:14–23 (explaining that the STN numbers are not included on forms given out to inmates because "it is a public – a safety issue"). Mr. Mustafa does not contest that this is the DOC policy, but argues he does not know if his score was kept confidential because "he cannot know how many individuals had access to the score." Pl.'s Rules 56(a) Statement 4 ¶ 13. Mr. Mustafa does not provide any evidence that a DOC official shared his STN score with anyone. In fact, Mr. Mustafa stated that he openly complained about his STN score in front of other inmates and correctional staff. Pl.'s Dep. at 45:12–5. Mr. Mustafa further stated that he "didn't want to keep anything a secret" and he was "pretty transparent" about his STN score. *Id.*

The parties have not provided, and the Court has not identified a case in which the publication element was satisfied by a plaintiff's voluntary publication. In fact, many courts appear to foreclose stigma plus claims where the plaintiff consented to the publication, *see Walker v. Daines*, No. 08-CV-4861 (JG) (LB), 2009 WL 2182387, at *10 (E.D.N.Y. July 21, 2009) (finding publication element of stigma plus claim was not met because the defamatory statement was kept in an internal record that would only be disclosed to prospective employers if

23

the plaintiff consented), or the plaintiff failed to provide evidence that the defendants were

personally involved in publicizing the statements, *see Bertgulia v. City of New York*, 839 F.

Supp. 2d 703, 725 (S.D.N.Y. 2012) (granting motion to dismiss stigma plus claim where plaintiff

failed to allege that the defendants were "personally involved" in disseminating the stigmatizing

statements); *Brooks v. Jackson*, No. 11 Civ. 6627 (JMF), 2013 WL 5339151, at *11 (S.D.N.Y.

Sept. 23, 2013) (granting motion to dismiss stigma plus claim where plaintiff did not make any

allegations that the defendants publicized the stigmatizing statements).

     Thus, because Mr. Mustafa has only provided "unsubstantiated speculation" that his

score was not kept confidential by DOC officials, this Court cannot draw an inference of a

genuine dispute of material fact. *See Robinson*, 781 F.3d at 44 (citation omitted); *Brown v. Eli

Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). Without any such evidence, "there can be but one

reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250.

     Accordingly, the Court will grant the motion for summary judgment on the due process

claim.

### C. Eighth Amendment Claim Against Officer Peletier

#### 1. Merits of the Claim

     The Eighth Amendment protects against punishments that "involve the unnecessary and

wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). An inmate alleging

excessive force in violation of the Eighth Amendment has the burden of establishing both an

objective and subjective component to his claim. *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000);

*see also Hudson v. McMillian*, 503 U.S. 1 (1992) (establishing the minimum standard to be

applied in determining whether force by a correctional officer against a sentenced inmate states a

constitutional claim under the Eighth Amendment); *Romano v. Howarth*, 998 F.2d 101, 105 (2d

Cir. 1993) (analyzing both an objective and subjective component of an Eighth Amendment claim) (citing *Hudson*, 503 U.S. at 6–7). When an inmate claims that excessive force has been used against him or her by a prison official, he or she has the burden of establishing both an objective and subjective component to his claim. *See Romano*, 998 F.2d at 105.

To meet the objective component, the inmate must allege that the defendant's conduct was serious enough to have violated "contemporary standards of decency." *Hudson*, 503 U.S. at 8 (internal quotation marks and citation omitted). A *de minimis* use of force will rarely be sufficient to satisfy the objective element unless that force is also "repugnant to the conscience of mankind." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (internal quotation marks omitted) (quoting *Hudson*, 503 U.S. at 9–10). It is the force used, however, not the injury sustained, that "ultimately counts." *Id.* A malicious use of force constitutes a *per se* Eighth Amendment violation because "contemporary standards of decency are always violated." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Hudson*, 503 U.S. at 9).

The extent of the inmate's injuries as a result of the defendant's conduct are not a factor in determining the objective component. *See Wilkins*, 559 U.S. at 37 (noting that the "core judicial inquiry" is "not whether a certain quantum of injury was sustained," but rather whether unreasonable force was applied given the circumstances); *Hudson*, 503 U.S. at 9 (stating that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated" irrespective of whether significant injury is present).

The subjective component requires a showing that the prison officials acted wantonly and focuses on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). The relevant factors include "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the

responsible officials, and any efforts made to temper the severity of a forceful response." *Id.* (internal quotations and citation omitted).

Defendants argue that Officer Peletier's alleged[11] misuse of force was *de minimis* as a matter of law and therefore does not violate the Eighth Amendment because, while the conduct was unprofessional and inappropriate, it was not "repugnant to the conscience of mankind." Des.' Mot. at 14–16.

Plaintiff argues that Officer Peletier's misuse of force violated the Eighth Amendment because it served no legitimate correctional purpose and was done solely to harm, humiliate, and scare Mr. Mustafa, and therefore, cannot be considered *de minimis* as a matter of law. Pl.'s Opp'n at 17–19.

The Court agrees.

There is a mix of authority concerning whether Officer Peletier's conduct was *de minimus* as a matter of law. The Second Circuit has declined to state that similar claims are *de minimus* as a matter of law. *See Hogan v. Fisher*, 738 F.3d 509, 515–16 (2d Cir. 2013) ("We are unwilling to accept, as a matter of law, the proposition that spraying an inmate with a mixture of feces, vinegar, and machine oil constitutes a *de minimus* use of force.").

On the other hand, Defendants point to examples of courts in other jurisdictions that have found similar conduct to be *de minimus* as a matter of law. *See, e.g.*, *Samuels v. Hawkins*, 157 F.3d 557, 558 (8th Cir. 1998) (finding the use of force to be *de minimus* where the officer threw a cup of unidentified liquid into the cell and onto the plaintiff); *Fackler v. Dillard*, No. 06-10466, 2006 WL 2404498, at *3–4 (E.D. Mich. Aug. 16, 2006) (finding the use of force to be *de minimus* where the officer threw a cup of urine onto the plaintiff in her cell).

---

[11] Defendants dispute that the incident occurred at all, but assume, for the purposes of the motion for summary judgment, that plaintiff's description of the events is true. Defs.' Mot. at 15.

Given the Second Circuit's stance on similar conduct and the absence of binding law compelling the Court to find Officer Peletier's specific conduct to be *de minimus* as a matter of law, the Court declines to do so.

### 2. Qualified Immunity for Officer Peletier

Defendants argue that, even if the Court does not find that Officer Peletier's conduct is *de minimus* as a matter of law, he is immune from suit because there is no clearly established law that his conduct would amount to a constitutional violation under these specific circumstances. Defs.' Mot. at 17–20.

Plaintiff responds that Officer Peletier is not immune from suit because Officer Peletier had fair notice, through clearly established case law, that "a prison official's use of force against an inmate . . . that do[es] not serve a penological purpose violate[s] the inmate's constitutional rights." Pl.'s Opp'n at 20–22 (quoting *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 353–54 (N.D.N.Y. 2010) (internal quotation marks omitted)).

The Court agrees.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "provides government officials 'immunity from suit rather than a mere defense to liability.'" *Looney v. Black*, 702 F.3d 701, 705 (2d Cir. 2012) (quoting *Pearson*, 555 U.S. at 231). However, "[a] defendant is entitled to qualified immunity only if he can show that, viewing the evidence in the light most favorable to plaintiffs, no reasonable jury could conclude that the defendant acted

unreasonably in light of the clearly established law." *Golodner v. Berliner*, 770 F.3d 196, 205 (2d Cir. 2014) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 148 (2d Cir. 2006)).

"To overcome the defense of qualified immunity, a plaintiff must show both (1) the violation of a constitutional right and (2) that the constitutional right was clearly established at the time of the alleged violation." *Huth v. Haslun*, 598 F.3d 70, 73 (2d Cir. 2010) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).[12]

"[T]he clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 501 (2019) (finding that defining the clearly established right as "the right to be free of excessive force" was too general). It is a "constitutional right[ ] of which a reasonable person would have known" and "reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal citations and quotations omitted). "For law to be clearly established, it is not necessary to identify a case directly on point. But precedent must have spoken with sufficient clarity to have placed the constitutional question at issue beyond debate." *Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019) (citing *Al-Kidd*, 653 U.S. at 735).

It is clearly established that throwing urine into an inmate's cell, for no purported penological purpose, is not a *de minimus* use of force as a matter of law. *See Hogan*, 738 F.3d at 515–16. It is also clearly established that "'the malicious use' of more than *de minimis* force 'to cause harm' is a per se violation of the Eighth Amendment[.]" *Fabricio v. Annucci*, 790 F. App'x 308, 310–11 (2d Cir. 2019) (quoting *Harris v. Miller*, 818 F.3d 49, 64 (2d Cir. 2016)).

---

[12] Courts need not consider these two questions in order, and may consider the latter question first, which may be "particularly appropriate where the former turns on difficult or novel questions of constitutional or statutory interpretation, but it is nevertheless clear that the challenged conduct was not objectively unreasonable in light of existing law." *Zalaski v. City of Hartford*, 723 F.3d 382, 388–89 (2d Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)) (internal quotation marks omitted).

Defendants do not offer any penological reason for why Officer Peletier threw juice at Mr. Mustafa or why, after "launch[ing]" the juice, Officer Peletier told Mr. Mustafa if "you mess with one of us, you mess with all of us." Pl.'s Rule 56(a) Statement 4–5 ¶¶ 13–15; Pl.'s Dep. at 70:2–8. And, as discussed in the previous section, there is a genuine issue of fact concerning whether Officer Peletier's conduct was *de minimus*. *See Hogan*, 738 F.3d at 515–16; *see also Jones v. Treubig*, 963 F.3d 214, 225 (2d Cir. 2020) ("[A]n officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury." (quoting *Terebesi v. Torreso*, 764 F.3d 217, 237 (2d Cir. 2014)) (internal quotation marks omitted). Therefore, a reasonable jury could conclude that Officer Peletier's conduct was not *de minimus* because he threw liquid onto Mr. Mustafa without a legitimate penological purpose. *See Hogan*, 738 F.3d at 515–16.

Additionally, a reasonable juror could conclude that Officer Peletier acted with malice due to his threatening statement that "you mess with one of us, you mess with all of us," Pl.'s Rule 56(a) Statement ¶¶ 13–15; Pl.'s Dep. at 70:2–8, and therefore, that Officer Peletier's conduct constituted the malicious use of more than *de minimus* force, which is a *per se* violation of the Eighth Amendment. *Fabricio*, 790 F. App'x at 310–11 (quoting *Harris*, 818 F.3d at 64).

Accordingly, the Court will deny Defendants' motion for summary judgment as to Mr. Mustafa's Eighth Amendment claims against Officer Peletier.

### D.  Deliberate Indifference Claim Against Lieutenant Swan

In the Complaint, Mr. Mustafa alleged that Lieutenant Swan refused to act on his allegations of misconduct by correctional officials, refused to assist him with filing a report, and told him that no relief would be forthcoming. Compl. 9–10 ¶¶ 24, 28–30. In the Initial Review Order, this Court found that "[t]hese allegations sufficiently raise an inference that Lieutenant Swan had notice of Officers Byars and Pel[e]tier's misconduct but failed to remedy their misconduct." IRO

at 10. The Court noted that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2nd Cir. 2013), but assumed for the purposes of the ruling that *Colon* remained valid. IRO at 10 n.5.

Defendants argue that *Tangreti v. Bachmann*, which was published after this Court issued its Initial Review Order, compels the Court to dismiss the supervisor liability claim against Lieutenant Swan because Mr. Mustafa must plead and prove that "each Government-official defendant, through the individual's own individual actions, has violated the Constitution." Defs.' Mot. at 16–17 (quoting 983 F.3d 609, 618 (2d Cir. 2020))

Plaintiff argues that *Tangreti* does not impact the Court's reasoning and Lieutenant Swan can still be held liable because he had notice of the misconduct but failed to remedy it. Pl.'s Opp'n at 19.

The Court disagrees.

In *Tangreti*, the Second Circuit held that *Iqbal* requires a plaintiff to "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 983 F.3d at 616 (quoting *Iqbal*, 556 U.S. at 676) (internal quotation marks omitted). The Second Circuit further explained that "for deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Id.* The *Tangreti* court focused its analysis on whether the supervisor had enough information before the incident occurred to show that the supervisor "could have or should have made an inference of the risk of" misconduct. *Id.* at 619.

Here, Mr. Mustafa alleges that Lieutenant Swan was aware of the misconduct after it happened but did not allow Mr. Mustafa to report the issues to the police or take any steps to remedy the issue. *See* Compl. 8–10 ¶¶ 22, 24, 28–30. There are no allegations or evidence to suggest that

30

Lieutenant Swan knew of Officer Byars' or Peletier's propensity for such conduct prior to the incidents and failed to prevent such misconduct. Additionally, there is no evidence that the misconduct was ongoing. *See Gomez v. Westchester County*, No. 18-cv-244 (NSR), 2021 WL 4443379, at *14 (S.D.N.Y. Sept. 28, 2021) (dismissing supervisory liability claim because "personal involvement can be found where [a] denied grievance alleges an ongoing constitutional violation that the supervisory official who reviews the grievance can remedy directly," but the plaintiff "failed to allege any ongoing constitutional violations").

Accordingly, the Court will grant Defendants' motion for summary judgment as to Mr. Mustafa's claim against Lieutenant Swan.

### E. State Law Assault Claim

The Court will retain jurisdiction over the state law assault claim under its supplemental jurisdiction because Plaintiff's federal claims arising from the same conduct have not been dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part.**

**SO ORDERED** at Bridgeport, Connecticut, this 9th day of September, 2022.

   /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge